## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

CRYPTOKNIGHT LLC

     Plaintiff

v.

RITE BODHI LTD., RIAZ MEHTA,
JOSEPH KAHN, DAMIAN MILES,
and SAM GOLLESTANI,

     Defendants.

Case No.

## **COMPLAINT**

Plaintiff Cryptoknight LLC ("CryptoKnight") sues Defendants Rite Bodhi Ltd., Riaz Mehta, Joseph Kahn, Damian Miles, and Sam Gollestani (collectively, the "Defendants"), and alleges as follows:

1.    For several years, CryptoKnight has offered a variety of entertainment services regarding cryptocurrency through livestreamed shows, social media, and online communities.

2.    Rite Bodhi Ltd., Riaz Mehta, Joseph Kahn, Damian Miles and Sam Gollestani made a deliberate decision to bulldoze over and infringe CryptoKnight's intellectual property rights, including those established by CryptoKnight's registered trademark.

3.    Defendants did so by developing, filming, and extensively promoting a reality show they titled "Cryptoknights." Defendants intend to imminently air the show globally on one or more streaming platforms.

1

4.     In connection with this show, Defendants have launched and sold multiple crypto assets, including non-fungible tokens. Defendants have also used the hype generated for their blatantly infringing Cryptoknights show to drive sales of the $RITE token, a project owned and controlled by several Defendants.

5.     CryptoKnight knows this decision was deliberate and willful because the Defendants directed their legal counsel to reach out to counsel for CryptoKnight, anonymously, seeking to purchase the registered trademark and associated rights.

6.     Defendants would certainly not have done this, and done in it a way in which their own attorneys expressly refused to identify who their clients were, had they not been aware of CryptoKnight's rights.

7.     Once CryptoKnight confronted Defendants' attorneys regarding their unlawful use, Defendants essentially took the position that they had nothing to worry about regarding violations of United States law because they were running their illicit enterprise out of a shell company in the British Virgin Islands and the show was being filmed in Singapore.

8.     Unfortunately for Defendants, this is not the law. Defendants have made, at bare minimum, hundreds of thousands of dollars through their infringement already.

9.     Undeterred by pesky considerations such as the rights of others, Defendants seek to make more from broadcasting their show in the United States

and continuing to sell crypto assets to United States consumers using the Cryptoknights name and brand.

10.     Defendants' unlawful use of Plaintiff's registered trademark to shill their proprietary crypto assets and line their pockets has and will continue to irreparably harm Plaintiff's hard-won reputation in the crypto space.

## PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff Cryptoknight LLC is a Florida limited liability company based in Orlando, Florida.

12.     Defendant Rite Bodhi Ltd. d/b/a Ritestream ("Ritestream") is a limited company registered in the British Virgin Islands.

13.     Defendant Riaz Mehta is an individual who upon information and belief resides in Singapore. Mehta is the CEO of Ritestream.

14.     Defendant Joseph Kahn is an individual who upon information and belief resides in Singapore. Kahn is the Chief Strategy Officer of Ritestream.

15.     Defendant Damian Miles is an individual who upon information and belief resides in Brisbane, Austraila. Miles is the Chief Technology Officer of Ritestream.

16.     Defendant Sam Gollestani is an individual who upon information and belief resides in Los Angeles, California.

17.     Defendants are subject to the jurisdiction of this Court because they have committed wrongful acts, including trademark infringement and false

advertising, directed to the state of Florida and which have caused harm to Plaintiff in the state of Florida.

18.    Defendants have directed substantial conduct towards the state of Florida in connection with the wrongful acts alleged against them, including the marketing of the infringing Cryptoknights show to consumers in Florida, and upon information and belief, have undertaken the sale of cryptocurrencies using the infringing Cryptoknights name to individuals in Florida.

19.    Venue is proper in this Court because a substantial amount of the events giving rise to the causes of action occurred in this district, and Plaintiff suffered harm in this district based on Defendant's conduct.

## FACTUAL BACKGROUND

20.    CryptoKnight was founded in 2020 with a goal to educate individuals in connection with their purchases of cryptocurrencies, non-fungible tokens ("NFTs"), and other related technologies.

21.    Since its inception, CryptoKnight has produced content on various platforms including YouTube, TikTok, X/Twitter, Facebook, and others.

22.    CryptoKnight has also built and maintained a thriving community on the communication app Discord, where members discuss cryptocurrency industry trends and similar topics.

23.    Through its activities, CryptoKnight has developed substantial recognition among its members and consumers generally. CryptoKnight has

4

accumulated goodwill and a positive reputation in connection with its information and educational content.

24. This is particularly significant in the cryptocurrency industry, as reputations are critical in the evolving ecosystem. Because of the prevalence of "pump and dump" schemes in new crypto projects, industry experts caution that consumers should consider the reputation of individuals behind a project before purchasing cryptocurrency.[1]

25. CryptoKnight filed an application with the United States Patent and Trademark Office to register CRYPTOKNIGHT as a trademark on October 18, 2021 based on CryptoKnight's active use of the CRYPTOKNIGHT mark.

26. On June 13, 2023, the USPTO granted Plaintiff Registration No. 7,078,178 for CRYPTOKNIGHT (the "Registration"), in connection with:

    a. "Providing on-line chat rooms and electronic bulletin boards for transmission of messages among users in the field of stocks, trading, cryptocurrency, and financial markets" in International Class 38; and

    b. "Entertainment services, namely, an ongoing series featuring information on stocks, trading, cryptocurrency, and financial markets provided through livestreamed shows and segments online; Providing on-line training in the form of courses in the field of stocks, trading, cryptocurrency, and financial markets; Providing online non-downloadable videos in the field of stocks, trading, cryptocurrency,

---

[1] *See, e.g.*, https://www.ledger.com/academy/what-is-a-pump-and-dump-in-crypto.

and financial markets; Providing a website featuring blogs and non-downloadable publications in the nature of articles, reports, and interviews in the field(s) of stocks, trading, cryptocurrency, and financial markets" in International Class 41.

27.   CryptoKnight owns the Registration and the Registration remains in full force and effect. A true and correct copy of the Registration certificate is attached as Exhibit A.

28.   CryptoKnight actively uses the mark CRYPTOKNIGHT and has used this mark in connection with its offerings, including entertainment and informative services related to cryptocurrency, since 2020.

29.   Defendants have developed a pitch-based reality show they have titled "CryptoKnights," (the "Infringing Show") which they tout as "the Shark Tank of crypto."[2]

30.   Defendant Ritestream promotes the Infringing Show as its featured project and positions the Infringing Show as its key media offering.

31.   The individual defendants are all listed as key personnel in the development, management, production, and intended distribution of the Infringing Show:[3]

a.   Mehta is listed as the CEO & Co-Founder

b.   Kahn is listed as Chief Strategist

---

[2] https://www.prnewswire.com/news-releases/cryptoknights-unveils-the-future-of-finance-and-technology-in-a-groundbreaking-new-reality-series-302259520.html.
[3] https://www.cryptoknights.tv/about/.

6

    c.  Miles is listed as Chief Technology Officer

    d.  Gollestani is listed as the Director and Producer of the show

32.    Defendants describe the Infringing Show as a high-visibility opportunity for cryptocurrency entrepreneurs to pitch their ideas to a panel of "Knights" with the goal of obtaining the investment or support of these "Knights."

33.    Upon information and belief, Defendants began recording the Infringing Show in August 2024.

34.    Defendants have stated they intend to release the show beginning in Q4 of 2024.

35.    Defendants intend to release the show on their own streaming application as well as other undefined "global streaming platforms."

36.    Defendants represent that they are in talks with Amazon Prime Video, MGM Studios, Paramount, and HBO in connection with distribution of the Infringing Show.

37.    Defendants have created a website, cryptoknights.tv, to promote the Infringing Show.

38.    Defendants have created accounts on multiple social media platforms to promote the Infringing Show:

    a.  CryptoKnightsShow, @cryptoknightsHQ, on X, with 49,600 followers;

    b.  CryptoKnights TV Show, @CryptoKnightsTVShow, on YouTube, with 37,000 subscribers;

c. CryptoKnights on Facebook;

d. cryptoknightstvshow on Instagram.

39.    Upon information and belief, individuals in the state of Florida have viewed and accessed the website and social media postings made by Defendants using the infringing Cryptoknights name.

40.    Defendants conspicuously emphasize the ability of viewers to invest in the projects appearing on the Infringing Show, characterizing this as analogous to investments made by venture capitalists:[4]

**ABOUT**    CryptoKnights is the only global TV show that lets you invest in the hottest crypto projects as game-changing entrepreneurs pitch in front of 100s of millions of viewers. Produced by an Emmy-nominated team. Powered by $RITE.

**CRYPTO KNIGHTS PAD**    Imagine that you could invest alongside Kevin O'Leary or Mark Cuban in projects that pitch on Shark Tank? Well, you can directly invest in the projects that appear on CryptoKnights. Stake $RITE and get early access, just like VCs do.

**WHAT MAKES CRYPTOKNIGHTS PAD UNIQUE?**    ^

Are we a launchpad? Oh no. We're much more. We're on steroids. Unlike traditional platforms, we offer retail investors exclusive access to private and early-stage rounds, just like venture capitalists. What's more, we give these projects exposure to 100s of millions via our TV show. In both ways, you get in on the ground floor of the next big crypto projects before they explode.

41.    These investments are facilitated through the $RITE token. The $RITE token is developed and controlled by Ritestream.

---

[4] https://www.cryptoknights.tv/; https://www.cryptoknights.tv/invest/; *see also* https://www.ritestream.io/cryptoknights.

42.     Based on Ritestream's token reporting, 210,000,000 $RITE tokens, or 21% of all $RITE, are allocated to the Ritestream team, which includes Defendants Mehta, Kahn, and Miles.

43.     It is currently unknown exactly how many $RITE tokens are held or controlled by Defendants Mehta, Kahn, and Miles.

44.     An additional 200,000,000 $RITE tokens are held in "Treasury." Upon information and belief these "Treasury" tokens are held by or under the control of Ritestream.

45.     Defendants' website encourages consumers to purchase $RITE for "exclusive access" and to stake more $RITE to get more exclusive tokens.[5] By staking $RITE, users pledge their tokens directly back to the network, rendering the tokens unable to be transferred or traded.

46.     Defendants lay out a process directing a viewer to purchase $RITE and invest it with the Infringing Show, with promises of valuable tokens that can then be traded on a proprietary marketplace:[6]

---

[5] Staking is a process for validation of cryptocurrency transactions. For more information, *see* https://www.coinbase.com/learn/crypto-basics/what-is-staking.
[6] https://www.cryptoknights.tv/invest/.



47.    Just below this inducement are direct links for consumers to buy or stake $RITE.

48.    Consumers may purchase $RITE on various cryptocurrency exchanges. Transactions on these exchanges involve a current holder of $RITE transferring the tokens to the purchaser in exchange for one or more other cryptocurrency tokens.

49.    In other words, increasing demand for $RITE benefits Defendants who hold and control $RITE tokens by creating a market for them to offload their $RITE tokens to other consumers in exchange for more common and readily tradable cryptocurrencies such as Bitcoin and Ethereum.

50.    Upon information and belief, individuals in Florida have likely purchased or traded in $RITE.

51.    Separately, Ritestream has launched an NFT project titled "Cryptoknights S1: Official NFT Collection" (the "Infringing NFTs").[7]

52.    The Infringing NFTs can be purchased using U.S. Dollar Tether ("USDT"). USDT is a cryptocurrency known as a stablecoin, and its value is pegged to the U.S. Dollar.

53.    Once Ritestream receives the USDT in exchange for the Infringing NFTs, Ritestream can readily redeem the USDT for U.S. dollars, other fiat currency, or other readily tradable cryptocurrencies.

54.    More simply, the Infringing NFTs are sold by Ritestream for direct and definite equivalents of U.S. currency.

55.    Similar to other representations about the Infringing Show, the primary focus of the Infringing NFTs is the promise of tokens, and thus an interest in, projects appearing on the Infringing Show:[8]



---

[7] https://nft.ritestream.io/; see also https://medium.com/ritestream/cryptoknights-nft-whitelisting-and-purchasing-guide-f7b18984212a.
[8] https://nft.ritestream.io/.

56.     The Infringing NFTs are divided into three tiers: Seed, Private, and Public.

57.     The Seed series of Infringing NFTs sold for $150 each. A total of 2,500 Seed series Infringing NFTs were offered.

58.     Based on Ritestream's website, the Seed series of Infringing NFTs are sold out. At the stated sales price, Ritestream has received $375,000 from the sale of the Seed Infringing NFTs.

59.     The Private series of Infringing NFTs are listed at a price of $175. Ritestream states that between 2,000 and 3,500 Private Infringing NFTs were to be sold.

60.     Upon information and belief, and upon Ritestream's representations, the sale of the Private series of Infringing NFTs occurred in April 2024. This sale would have generated between $350,000 and $612,500 for Ritestream.

61.     The Public series of Infringing NFTs are listed at a price of $250. Ritestream states that between 3,500 and 5,000 Public Infringing NFTs were or are to be sold.

62.     CryptoKnight has been unable to determine whether the Public Infringing NFTs have been sold yet.

63.     Upon information and belief, individuals in Florida have likely purchased the Infringing NFTs.

64.     Notably, both the Seed and Private series required the purchaser to have purchased and staked $RITE.

65.    Purchasers were required to have staked 5,000 $RITE in order to purchase one Private series Infringing NFT. For each additional 5,000 $RITE staked, the individual was allocated an additional Private series Infringing NFT to purchase.

66.    Seed purchases were only open to individuals staking at minimum an astonishing 500,000 $RITE.

67.    This setup permits Defendants to double-dip. Purchasers must first buy $RITE for staking, which benefits Defendants as noted above, for the privilege of then paying Defendants more money to buy the Infringing NFTs.

68.    Defendant Mehta does not shy away from admitting that the whole system Ritestream has set up is designed to repeatedly skim profits from NFT projects:[9]

> For ritestream itself, whenever we have a film or TV project on ritestream, then they do a capital raise, then we do get a percentage of that raises revenues. And then when those NFTs get resold or they get traded, we get a percentage of that as well.
>
> So that's ongoing revenue for the ritestream platform. And when we talk about revenues, we retain some of the NFTs from these projects as well. So if that project does extremely well, then the value of that NFT will increase. And again, that brings income back into the company. And then of course, we have got the burning mechanism as well, of the revenues that come in to buy back and burn our tokens, which means essentially, the supply is going down over time, and the demand goes up and economics kick in.

---

[9] https://medium.com/ritestream/ceo-riaz-mehta-ladytraderra-ama-key-takeaways-66dd07e710c0.

69.    Given the value of keeping consumers' money in the $RITE ecosystem, it is no surprise that Mehta aggressively encourages consumers to lock up their $RITE and Ritestream-related NFTs with Ritestream:[10]

> Benefits are coming out of everywhere. Okay, here's a cool benefit: You lock up your $RITE token and you won't be itching to sell it as the market goes up and down and then you'll look back, six months down the track when all these things are out and about and you'll be going, "I'm so glad that I locked them up because now, they seem like they're worth a lot more than when I started that journey." So it prevents you from the typical human instinct saying "What do I do? Should I buy or sell?" So it's a nice mechanism.

70.    None of this would be possible without Defendants ubiquitous use of "Cryptoknights," a blatant infringement of CryptoKnight's Registration and associated rights.

71.    Defendants have profited from the infringing use of the Registration, including nearly $1 million in sales of the Infringing NFTs and unknown amounts of $RITE sold based on the promises of the Infringing Show.

72.    Unless enjoined, Defendants will continue to profit from infringement on the Registration.

73.    Particularly concerning is the questionable legality of the activities Defendants are conducting under Cryptoknights banner.

---

[10] *Id.*

74.    Defendants entire premise to viewers is the ability to invest in crypto businesses that appear on the Infringing Show - expressly comparing this opportunity to venture capital investments.

75.    Under these circumstances, Defendants conduct appears to constitute the unlawful sale of unregistered securities, or the facilitating of the unlawful sale of unregistered securities of the projects appearing on the Infringing Show.

76.    This investment purpose is also the only featured aspect of the Infringing NFTs. No other utilities of the Infringing NFTs are specified.

77.    The U.S. Securities and Exchange Commission has previously asserted that NFTs without utility are "investment contracts" and thus securities, and the unregistered sale of such NFTs is unlawful under U.S. law.

78.    Therefore, it appears likely that Ritestream's sale of the Infringing NFTs is an unlawful offering and sale of securities.

79.    Alternatively, if the cryptocurrency assets touted by Defendants are considered commodities rather than securities, Defendants are soliciting individuals to place cryptocurrencies with them for trading and exchange on a marketplace controlled by Ritestream. This appears likely to constitute the operation of an unregistered commodity trading pool by Ritestream and Defendants Mehta, Miles, and Kahn.

80.    At minimum, Defendants are relying on widespread infringement of the Registration to induce consumers to give them money via $RITE and the

Infringing NFTs, and to lock that money in with Defendants with promises of speculative rewards.

81.    Defendants' infringement of the Registration in connection with legally and morally dubious activities will cause irreparable harm to CryptoKnight's reputation in the cryptocurrency world.

82.    The attempt to low-ball an acquisition of the Registration only after substantial infringing activity demonstrates Defendants' complete disregard for CryptoKnight's rights. That Defendants treated addressing CryptoKnight's rights in the term Cryptoknight as a minor loose end to clean up just before their show launched demonstrates Defendants' infringement was willful and malicious.

## Count I – Trademark Infringement

## (15 U.S.C. § 1114)

83.    CryptoKnight re-alleges and incorporates paragraphs 1-82 above as if fully set forth herein.

84.    CryptoKnight owns the Registration for CRYPTOKNIGHT and otherwise has rights in that term.

85.    CryptoKnight has not licensed or authorized Defendants to use the Registration.

86.    Defendants use of the term "Cryptoknights" in connection with the Infringing Show, Infringing NFTs, and other activities is likely to cause confusion or mistake among consumers that Defendants' goods and services are offered by, endorsed by, or affiliated with CryptoKnight.

87.    Defendants have profited from their infringing activity.

88.    Defendants infringing conduct was undertaken with deliberate intention to infringe or with willful blindness to CryptoKnight's rights.

89.    As a result of Defendants' conduct, CryptoKnight has suffered damages.

90.    Defendants plan to imminently launch the Infringing Show in the U.S. and worldwide, which will cause further damage to CryptoKnight's reputation and goodwill, and will further financially enrich Defendants.

91.    Each of Mehta, Kahn, Miles, and Gollestani have aided, controlled, induced, directed, and contributed to the infringing conduct alleged herein.

WHEREFORE, CryptoKnight requests the Court enter judgment against Defendants for infringement of the Registration, enter a permanent injunction against any use of the term "Cryptoknights" or any variation thereof, order disgorgement of all revenues received by Defendants in connection with the Infringing Show, Infringing NFTs, and sales or transfers of $RITE, and award Plaintiff damages (including treble damages for willful infringement), attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count II – False Designation of Origin

### (15 U.S.C. § 1125(a))

92.    CryptoKnight re-alleges and incorporates paragraphs 1-82 above as if fully set forth herein.

93.   CryptoKnight owns the Registration for CRYPTOKNIGHT and otherwise has rights in that term.

94.   Defendants have and will continue to use the term Cryptoknights in connection with commercial activities. This term is confusingly similar to CryptoKnight's CRYPTOKNIGHT Registration.

95.   This conduct by Defendants is likely to cause confusion, mistake, or otherwise deceive consumers in violation of 15 U.S.C. § 1125(a).

WHEREFORE, CryptoKnight requests the Court enter judgment against Defendants, enter a permanent injunction against any use of the term "Cryptoknights" or any variation thereof, and award Plaintiff damages (including treble damages for willful misconduct), attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count III – Unfair Competition
### (15 U.S.C. § 1125(a))

96.   CryptoKnight re-alleges and incorporates paragraphs 1-82 above as if fully set forth herein.

97.   CryptoKnight owns the Registration for CRYPTOKNIGHT and otherwise has rights in that term.

98.   Defendants have and will continue to use the term Cryptoknights in connection with commercial activities. This term is confusingly similar to CryptoKnight's CRYPTOKNIGHT Registration.

99.   This conduct by Defendants is likely to cause confusion, mistake, or otherwise deceive consumers in violation of 15 U.S.C. § 1125(a).

WHEREFORE, CryptoKnight requests the Court enter judgment against Defendants, enter a permanent injunction against any use of the term "Cryptoknights" or any variation thereof, and award Plaintiff damages (including treble damages for willful misconduct), attorneys' fees, costs, and any other relief the Court deems just and proper.

### Count IV – Unfair Competition
### (Florida Common Law)

100.   CryptoKnight re-alleges and incorporates paragraphs 1-82 above as if fully set forth herein.

101.   CryptoKnight owns the Registration for CRYPTOKNIGHT and otherwise has rights in that term.

102.   Defendants have and will continue to use the term Cryptoknights in connection with commercial activities. This term is confusingly similar to CryptoKnight's CRYPTOKNIGHT Registration.

103.   This conduct by Defendants is likely to cause confusion, mistake, or otherwise deceive consumers as to the source or sponsorship of Defendants goods and services.

WHEREFORE, CryptoKnight requests the Court enter judgment against Defendants, enter a permanent injunction against any use of the term

"Cryptoknights" or any variation thereof, and award Plaintiff damages (including punitive damages), costs, and any other relief the Court deems just and proper.

### Count V – Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. § 501.207 *et seq.*)

104.     CryptoKnight re-alleges and incorporates paragraphs 1-82 above as if fully set forth herein.

105.     CryptoKnight owns the Registration for CRYPTOKNIGHT and otherwise has rights in that term.

106.     CryptoKnight have and will continue to use the term Cryptoknights in connection with commercial activities. This term is confusingly similar to Plaintiff's CRYPTOKNIGHT Registration.

107.     By infringing on CryptoKnight's trademark rights, Defendants have committed a deceptive or unfair trade practice.

108.     CryptoKnight has suffered damages as a result of Defendants' unfair and deceptive practices.

109.     This conduct by Defendants is likely to cause confusion, mistake, or otherwise deceive consumers in violation of 15 U.S.C. § 1125(a).

WHEREFORE, CryptoKnight requests the Court enter judgment against Defendants, enter a permanent injunction against any use of the term "Cryptoknights" or any variation thereof, and award Plaintiff damages (including punitive damages), attorneys' fees, costs, and any other relief the Court deems just and proper.

Respectfully submitted October 9, 2024.

**Adam C. Losey, Esq**.
Florida Bar No. 69658
**Ian T. Johnson, Esq.**
Florida Bar No. 1026225
LOSEY PLLC
1420 Edgewater Dr.
Orlando, FL 32804
(407) 906-1605
alosey@losey.law
ijohnson@losey.law
docketing@losey.law